IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SCOTT EMERSON FELIX,

    Petitioner

  v.

SHERIFF MICHAEL HENNESSEY

    Respondent.

No. C 01-3138 WHA (PR)

**ORDER DENYING WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY**

**INTRODUCTION**

This is a habeas action brought pursuant to 28 U.S.C. 2254 by a civil detainee under California's Sexually Violent Predators Act, California Welfare and Institutions Code § 6600. Petitioner filed his original federal habeas corpus petition in this action in August 2001. Because the petition contained both exhausted and unexhausted claims, a September 2001 order stayed it to allow petitioner an opportunity to exhaust the unexhausted claims. He subsequently filed an amended petition asserting nine claims and respondent moved to dismiss. Claims 1–3 and 6–9 were dismissed on the grounds that they were still unexhausted. Claim 5 was dismissed for failure to present a federal question. Only Claim 4 survived the motion.

In his remaining claim, petitioner argues that the trial judge at his July 1998 commitment proceeding erred in failing to instruct the jury to determine whether he was likely to commit a future predatory act and that the prosecutor compounded this error by telling the jury that it did not have to find he was likely to commit a predatory act. For the following reasons, the writ of habeas corpus is **DENIED**.

**STATEMENT**

In December 1982, petitioner Scott Emerson Felix was convicted of three counts of false imprisonment against three separate victims, two counts of oral copulation and one count of rape against two additional victims, and one count of assault with the intent to commit rape against a sixth victim. The crimes were committed in April, October, and September 1982. In each case, petitioner approached strangers on the street or in other public places, used threats or force against them, and attempted to or succeeded in forcing them to perform sexual acts on him. The trial court sentenced petitioner to nineteen years and four months in prison.

Petitioner, however, was released on parole sometime before 1993. He had numerous parole violations between October 1993 and December 1995. In May 1994, his parole was revoked for six months. He had been charged with several crimes, including assault and battery, possession of a dangerous weapon, possession of stolen property, and threats or harassment. In March 1995, his parole was revoked for one month, based on a curfew violation, dishonesty and noncooperation. In August 1995, Felix was arrested for stalking, but his parole was continued. In March 1996, petitioner's parole was revoked for violating a no-alcohol condition, and he was returned to custody for nine months.

Prior to petitioner's scheduled release in November 1996, the San Francisco district attorney filed a petition to have petitioner declared a sexually violent predator pursuant to Section 6600.

At petitioner's first civil commitment trial, the trial court declared a mistrial because the jury was unable to reach a unanimous verdict on whether petitioner qualified as a sexually violent predator. On retrial in July 1998, another jury found that petitioner was a sexually violent predator. The trial court committed petitioner to the Department of Mental Health for two years. His commitment was thereafter extended through the filing of subsequent petitions.

In September 2006 — while trial on the subsequent petitions was still pending — an amendment to the SVP law took effect that changed the term of commitment from two years to an indeterminate term. A motion was granted to amend the pending petitions so as to seek petitioner's indeterminate commitment.

A jury trial on whether to renew petitioner's commitment was held in October 2006. The jury found that petitioner was a SVP as defined in Section 6600 and petitioner was then committed to an indeterminate term. In December 2008, the California Court of Appeal upheld that judgment. *People v. Felix*, 169 Cal.App.4th 607 (2008).

* * *

The California Court of Appeal summarized the July 1998 SVP proceedings (Exh. 9 at 2–6) as follows:

> **The People's Case**
>
> Dr. Charlene Steen, a psychologist, diagnosed appellant as suffering from paraphilia, not otherwise specified (paraphilia n.o.s.), in remission. This disorder is defined as fantasies, urges, or behaviors of some type of sexual activity with a non-consenting person, involving humiliation or other unacceptable behavior. Even though appellant had not committed any sexual offenses since his 1982 conviction, she believed he continued to have paraphilia n.o.s. because (1) he had a pattern of sexually assaultive behavior prior to his conviction, which was analogous to "once an alcoholic, always an alcoholic;" (2) he had a prison disciplinary action involving verbal abuse and hostility toward a female medical employee; (3) he was accused of stalking while on parole; (4) statistically a rapist is likely to commit another rape; and (5) his alcohol dependence reduced his inhibitions. She believed he was more likely than not to reoffend based on her professional experience and actuarial research, his low motivation for treatment, and danger signs during his parole that he did not understand how to keep himself from dangerous situations even when closely supervised.
>
> Another psychologist, Dr. Jonathan French, also diagnosed appellant as suffering from paraphilia n.o.s., but not in remission, given his preconviction pattern of behavior and incidents of inappropriate behavior with women during parole that indicated he had little control over his impulses. Based on the parole incidents, Dr. French opined that appellant was headed toward active physical sexual violence, given his difficulty maintaining proper boundaries.
>
> Patricia Davis was the local parole agent supervisor in Salinas, where appellant was first paroled, and her office was next door to the motel where appellant lived. Appellant was classified as a high control parolee, and because he was assigned to a county where he had no local contacts, the parole office provided housing, employment referrals, food assistance and other services. Appellant's parole conditions included a 6:00 p.m. to 7:00 a.m. curfew. One evening, appellant knocked on the office window after hours, but before his curfew took effect, asking for food coupons. Davis instructed him to return during business hours

3

and speak to his parole agent. Several days later appellant returned to the closed office with a request. Davis told him that after-hours contact with her was inappropriate and to return in the morning to see his parole agent. Approximately a week later appellant made a third after hours visit, and Davis repeated her instructions. Concerned by these visits because she knew his history, Davis sought to have his parole revoked on a charge of stalking, which she later amended to harassment. His parole was not revoked but he was transferred to San Jose.

Appellant made no verbal or physical threats or sexual overtures during his three after hours visits to Davis, and each time departed without argument. While living in Salinas, appellant met with Davis about 20 times. She considered him demanding, overbearing, and angry, and several times while speaking to her and his parole agent, he stood up, attempting to intimidate them with his physical size and "buffed" condition.

Adrian Griffin was an instructor at a San Jose computer laboratory that assisted parolees. In February 1994 appellant was referred to her by his parole officer for help in preparing a resume and contacted her by telephone. He became angry when she explained that resume service was available only to enrolled students, but she offered to help him if he came into the laboratory for some lessons. Griffin became uncomfortable during his two visits to the laboratory because he asked personal questions. The day of his second visit, Griffin was in her car after work when she realized she was low on gas and had no cash. As she returned to the building to borrow money from a colleague, she encountered appellant at the back of the building. He asked if she was having car trouble, and she replied she simply needed money for gas. She initially refused his offer of $5, but given his persistence, took it to avoid insulting him, and he departed. Thinking his behavior odd, she contacted a parole agent and learned appellant was a serial rapist. Griffin planned to return the money when appellant next came to the laboratory, but she did not see him again until February 1995 in the building coffee shop. He asked for the $5 and began talking with her, but she told him she was busy and needed to get on her way.

In August 1995 Griffin was at a street corner in Palo Alto on her bicycle waiting for the light to change when appellant drove up to the same corner. He called out to her, but she told him she did not want to talk to him and rode away in the opposite direction. After riding two blocks, she saw appellant driving behind her at a pace to hold up traffic. She rode to a police station and telephoned appellant's parole agent, who surmised it was probably a chance encounter because appellant lived in the area. Griffin declined the agent's offer to speak to appellant. He told her that if she saw appellant again she should not act scared.

Griffin saw appellant again in August 1995 while riding her bicycle in Palo Alto. He passed her while she was waiting at a corner and gave her an unfriendly look. She rode into a bank parking lot, and appellant also drove into the lot. She rode behind a partition to hide herself. Appellant pulled alongside the

4

partition, then drove into the street. She walked to his car, yelling at him to stop following her and to leave her alone. Appellant drove away, and Griffin reported the incident to the parole officer.

**The Defense**

Dr. Theodore Donaldson, a psychologist, testified that according to one study for correlating risk factors and recidivism, appellant had a 21.1 percent likelihood of committing a violent sexual offense in the next 10 years. Over a longer period, the likelihood of reoffending would continue to increase, but the rate of increase would go down "quite rapidly." According to another test that was a "pretty good" predictor of rape, appellant's score was not high enough to indicate significant psychopathy, or "severe disturbance in character." He did not think the conclusions of Drs. Steen and French that appellant was more likely than not to reoffend were valid based on the factors they applied. He concluded appellant was not more likely than not to commit a sexually violent offense because his recent history of three relationships with women indicated an ability to relate to them without violence, indicating his impulsive erratic preconviction episodes had dissipated.

A second defense psychologist, Dr. Mary Ann Kim, concluded appellant did not suffer from paraphilia n.o.s. but from intermittent explosive disorder, now in remission. She opined that he was not likely to commit a sexually violent offense because he had not done so in 16 years, had ceased using drugs, understood his alcohol problem and, to some extent, had learned how to manage his anger. She acknowledged on cross-examination that in an earlier hearing she had testified that appellant was likely to reoffend if he did not have therapy.

Raul Torralba was appellant's parole agent in San Jose. Torralba received no complaints from the San Jose computer laboratory about inappropriate behavior by appellant. Sometime later Griffin telephoned him to report that appellant attempted to talk to her, but she refused. Appellant was living at the time near their Palo Alto point of contact. Torralba offered to speak to appellant and make no contact with her a condition of parole, but she thought it unnecessary. By August 24, 1995, appellant had moved back to San Jose and asked permission to go to Palo Alto to take his girlfriend to Stanford Hospital. Torralba agreed and so advised the Palo Alto Police Department. Appellant was arrested that day for stalking Griffin and charged with a parole violation, which the parole board dismissed.

Murray Brown was a parole agent assigned to a multi-agency Sexual Assault Felony Enforcement Team, which surreptitiously followed appellant several dozen times in 1995. On August 24, 1995, the team followed appellant to Palo Alto, where he dropped off his girlfriend at Stanford Hospital. He drove to a nearby bank, and after approximately five minutes in the parking lot, drove to a gas station, got gas, drove to another bank to use its ATM, and drove home to San Jose. The team did not see him make contact with or follow anyone.

5

> Appellant testified that Davis was the only employee in the Salinas parole office who could distribute food coupons. On a Friday, he asked his own agent for coupons, but the agent was unable to supply them because Davis was unavailable. Later in the evening he saw her go into the office, knocked on the door, and asked the cleaning person to get her. He was somewhat argumentative when Davis declined to give him coupons for the weekend, but departed when she told him to do so. On Monday he was charged with stalking. He said this was his only after-hours visit to the office.
>
> He did not try to "hit on" Griffin at the San Jose computer laboratory, but considered they had a professional relationship. He offered her the $5 for gas because she had been particularly helpful to him. He moved to Palo Alto to be closer to his girlfriend. He once saw Griffin when he was circling the block while waiting for his girlfriend to retrieve his laundry. He thought she waved and did not hear her say anything. Shortly thereafter he moved back to San Jose because his parole conditions required him to live 35 miles from San Francisco and Palo Alto was only 34.7 miles. On August 24, 1995, he obtained permission to take a new girlfriend to work at Stanford Hospital. After dropping her off, he decided to withdraw some money, made an abrupt U-turn into a bank parking lot, and coincidentally encountered Griffin. He greeted her, but when she told him she wanted nothing to do with him, he drove off.

## **ANALYSIS**

As grounds for habeas relief, petitioner claims that his due process rights were violated because the jury at his 1998 trial was not instructed that it was required to find that petitioner was likely to engage in sexually violent *predatory* behavior. "Predatory" acts for purposes of SVP commitment are defined as being directed toward "a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." California Welfare & Institutions Code § 6600(e).

Petitioner claims that the prosecutor compounded this error by telling the jury during closing arguments that they did not have to find that petitioner was likely to commit "predatory" offenses. The prosecutor told the jury (Exh. 2 at 1556):

> Now, how are you going to make your decision about this law here. It might seem like a lot because you have to decide is he is likely to commit sexually violent crimes at some point. It doesn't have to be the same type of crime like the predatory crime that he went into the joint over, a violent sexual crime of rape, sodomy,

6

> oral copulation. . . . Sexually violent crimes, that is what it is. It doesn't have to be predatory.

Petitioner's due process argument rests on the fact that the jury instruction violated California law. He emphasizes that six years after his 1996 commitment trial, the California Supreme Court held in *People v. Hurtado*, 28 Cal.4th 1179 (2002), that the "predatory" element was an implied requirement for SVP commitment. The California Supreme Court held that before a defendant could be committed or recommitted under the Sexually Violent Predators Act, the trier of fact must find beyond a reasonable doubt that the defendant is likely to commit sexually violent *predatory* behavior upon release. Thus, the judge or jury trying the case must determine not only whether the defendant is likely to engage in sexually violent criminal behavior, but also whether that behavior is likely to be directed "toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." *Hurtado*, 28 Cal.4th at 1182.

The holding in *Hurtado* that the trial court's jury instruction was erroneous was not based on the California Supreme Court's interpretation of federal constitutional rights, but on its interpretation of the language of the SVPA and the intent of the California legislature in passing that statute. *Id.* at 1188–89.

Even if it was error for the trial court in the present matter to not instruct the jury that it had to find that defendant was likely to commit predatory behavior, it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States. 28 U.S.C. 2241. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."). A petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process," and "alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).

7

Petitioner does not expressly assert or cite to any authority holding that federal due process directly forbids civil commitment in the absence of an instruction to the jury that it must find that likely future defenses will be "predatory." Petitioner instead argues that federal due process was violated due to instructional error regarding state law. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process. *See Estelle*, 502 U.S. at 72. In other words, a petitioner must show that the instructional error had a substantial and injurious effect or influence in determining the jury's verdict, rendering it contrary to general notions of fairness or in violation of some federal procedural right. To make such a showing, a petitioner must specifically show a reasonable probability that the result of the proceeding would have been different had the erroneous instruction not been given, considering the instructions as a whole in evaluating the magnitude of the error. *Lankford v. Arave*, 468 F.3d 578 (9th Cir. 2006).

The July 1998 jury found beyond a reasonable doubt that petitioner was likely to commit future sexual offenses but was erroneously not instructed to additionally determine beyond a reasonable doubt whether such offenses would likely be "predatory," in other words, whether they would likely be directed toward a stranger, a person of casual acquaintance, or a person with whom a relationship was established by petitioner for the primary purpose of victimization.

Assuming arguendo that the error in the jury instructions at petitioner's July 1998 trial constituted a federal due process violation, this issue is nevertheless moot because petitioner has been recommitted using the correct standard and has not preserved his objection. Petitioner completed the two-year period of commitment required by that trial, was given another trial in 2006, and was recommitted. The issue at petitioner's 2006 trial was whether he was currently (as of 2006) a sexually violent predator. It is undisputed that the 2006 jury instructions used the correct definition of "predatory."

The Ninth Circuit has found that a civil commitment for a specific term does not become moot where it has expired but been followed by a new involuntary civil commitment for a

8

specific term that relied upon the earlier commitment. *See Hubbart v. Knapp*, 379 F.3d 773, 777-78 (9th Cir. 2004). Unlike *Hubbart*, however, in the present action the 2006 trial did not depend upon petitioner's earlier commitment. The 2006 jury was *not* told about the specific evidence considered by the jury in the 1998 trial. Indeed during the course of its deliberations, the 2006 jury sent a note to the court which specifically asked for documentation related to petitioner's initial civil commitment (RT 670). The trial court responded that it could not review them because they had not been admitted into evidence (RT 672).

It was inevitable that the 2006 jury learn that petitioner was previously committed as a sexually violent predator in order to properly consider his most recent conduct and mental state and determine whether he currently qualifies as a sexually violent predator. The 2006 jury was properly instructed that it was not permitted to conclude that petitioner was currently a sexually violent predator "based solely on his alleged prior convictions" (RT 609).

It is true that the 2006 jury heard testimony that petitioner had been previously committed as a sexually violent predator. Specifically, Dr. Mark Scherrer, a clinical psychologist at Atascadero State Hospital, testified that petitioner had been previously committed as a sexually violent predator after a 1998 trial and that as a result, he had been committed to Atascadero State Hospital (RT 78). Dr. Dale Arnold, a psychologist who serves on the Sexually Violent Predator's evaluators panel, also testified that petitioner had been released in 1993 and then "was placed back into custody on a permanent basis or up until now from about May of '96" (RT 544).

Petitioner, however, did not object to this testimony from either Dr. Scherrer or Dr. Arnold during the 2006 trial. Nor did he request at the 2006 trial that the jury be told that the 1998 jury was instructed with the incorrect standard for "predatory." His argument that the 2006 jury's knowledge of his prior convictions inevitably tainted the 2006 trial is raised for the first time in the present petition and is therefore unexhausted and untimely.

**CONCLUSION**

The petition for writ of habeas corpus is **DENIED**. Rule 11(a) of the Rules Governing Section 2254 Cases require a district court to rule on whether a petitioner is entitled to a

9

1  certificate of appealability in the same order in which the petition is denied.  Petitioner has
2  failed to make a substantial showing that his claims amounted to a denial of his constitutional
3  rights or demonstrate that a reasonable jurist would find this Court's denial of his claim
4  debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Consequently, no certificate
5  of appealability is warranted in this case.  The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated:  August 11, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE